# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 20-1484V

| | |
|---|---|
| MITZI LEE,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: November 10, 2025 |

*Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Madelyn Weeks, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On October 28, 2020, Mitzi Lee filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered acute inflammatory demyelinating polyneuropathy ("AIDP"), a form of Guillain-Barré syndrome ("GBS"), and Bell's Palsy, caused in fact by the influenza ("flu") vaccine she received on November 11, 2018. Petition at 1, ¶¶ 2, 12. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. After Respondent conceded entitlement, the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Approximately 22 months after Petitioner was determined entitled to compensation, the parties informed me that they had reached an impasse in their damages discussions and requested that I set a schedule for

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$160,000.00 for past pain and suffering, plus $1,098.08 for past unreimbursed expenses. I do not find that any award for future pain and suffering or lost wages is warranted.**

I.   **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress

---

damages briefing and expert reports. Minute Entry dated Feb. 22, 2023 (regarding call held that day); Order, issued Mar. 3, 2023, ECF at 47.

contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II. Prior SPU Compensation of GBS Pain and Suffering[4]

### A. Data Regarding Compensation in SPU Flu/ GBS Cases

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of July 1, 2025, since SPU's inception ten years ago, 944 GBS cases have been resolved. Compensation has been awarded in the vast majority of cases (897), with the remaining 47 cases dismissed.

The data for all categories of theses damages decisions reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[5] Agreement |
|---|---|---|---|---|
| **Total Cases** | 62 | 441 | 22 | 372 |
| **Lowest** | $96,008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $152,831.02 | $125,000.00 | $135,575.00 | $100,000.00 |

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

3

| Median | $170,279.32 | $163,519.91 | $224,397.27 | $150,000.00 |
|---|---|---|---|---|
| 3rd Quartile | $187,372.52 | $242,280.55 | $358,778.33 | $220,000.00 |
| Largest | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

### B. Adjudication Specifically of GBS Pain and Suffering

Only a small minority of cases have involved a special master's adjudication of damages issues. The written decisions setting forth such determinations provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[6]

As of July 1, 2025, in nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering, over $100,000.00 has been awarded (with a lower sum, $92,500.00, only awarded once). The remaining sixty-one (61) awards far exceeded $100,000.00. The first-quartile value is $150,000.00. The median is $165,000.00. The third-quartile value is $174,375.00. The largest award was $197,500.00.

These decisions are informed by what is known about GBS, including its description as set forth in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 - 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

---

[6] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy ("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). *Id.* The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." *Id.* at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." *Id.* at (c)(15)(III).[7]

A consistent starting consideration is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[8] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is a petitioner's long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his

---

[7] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

[8] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

5

GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g., id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

In addition, "[t]he mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). But a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g., Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence often *supplements* the facts reflected in the medical records.

### III. The Parties' Arguments

The parties agree that Petitioner is entitled to $1,098.08 for past unreimbursed medical expenses. Petitioner's Brief in Support of Damages ("Brief") at 1, 23, filed Aug. 1, 2023, ECF No. 55; Respondent's Brief on Damages ("Opp") at 1, 39, filed Dec. 15, 2023, ECF No. 58; Petitioner's Reply Brief in Support of Damages ("Reply") at 1, 11, filed Feb. 26, 2024, ECF No. 61. Thus, the sole matters to be resolved pertain to the awards for pain and suffering (actual and future), plus lost wages.

For pain and suffering, Petitioner seeks $180,000.00, plus $9,000.00[9] in total sum for future – based upon yearly payments of $500.00 and a life expectancy of 18 years. Brief at 15-17, 17 n.3. Describing treatment that included an earlier trip to the emergency room ("ER") by ambulance for facial numbness and tingling, a return to the ER and six-

---

[9] Petitioner has not reduced this amount to its net present value as required by Section 15(f)(4)(A).

6

day hospitalization one week later with a complaint of gradually worsening lower leg weakness, and two courses of outpatient physical therapy ("PT") (the later for urinary incontinence), she favorably compares her initial year of illness to that suffered by the petitioners in *W.B., Gross, Robinson,* and *Gruba*[10] – decisions involving past pain and suffering awards ranging from $155,000.00 to $160,000.00. Brief at 11-12. She insists, however, that her award should be the same as in *T.M.* and *Dillenbeck*[11] - $180,000.00 and $170,000.00 for past pain and suffering, respectively, along with $500.00 annually for future, due to ongoing symptoms - including "difficulty with memory and concentration . . . [and] psychological symptoms such as anxiety, depression, and poor self-esteem" (Brief at 14); that required additional treatment, affected her ability to work, and resulted in her forced retirement (*id.* at 14-15). To support her claim for a future pain and suffering award, Petitioner cites the continued difficulties described in her signed declaration,[12] the opinion of her medical expert, Joseph S. Jeret, M.D., F.A.A.N.,[13] and statements from one of her treating neurologists. Brief at 15-17; *see* Ex. 10 at 18 (neurologist's opinion); Ex. 29 (Dr. Jeret's report); Ex. 44 (Petitioner's declaration).

For lost wages, Petitioner initially sought $680,274.00. Brief at 1, 23. Emphasizing her positive performance reviews prior to her illness, the six-months she was unable to work before returning in May 2019, and the difficulties she encountered thereafter, Petitioner insists that she "ultimately retired from her job in December 2019 after 34 years of employment as a Commonwealth of Virginia employee because of the ongoing cognitive difficulties . . . [and] began employment for a private broker as a real estate salesperson." Brief at 18-19. To support her assertion that the difficulties related to memory, cognition, and fatigue forced her early retirement, Petitioner cites the opinions of an expert, Dr. Joseph Jeret, and her psychologist and supporting affidavits from two co-workers. *Id.* at 18-20. Dr. Jeret acknowledges that "Petitioner had a history of stress

---

[10] *W.B. v. Sec'y of Health & Hum. Servs.,* No. 18-1634V, 2020 WL 5509686 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) (awarding $155,000.00 for past pain and suffering); *Gross v. Sec'y of Health & Hum. Servs.,* No. 19-0835V, 2021 WL 2666685 (Fed. Cl. Spec. Mstr. Mar. 11, 2021) (awarding $160,000.00 for past pain and suffering); *Robinson v. Sec'y of Health & Hum. Servs.,* No. 18-0088V, 2020 WL 5820967 (Fed. Cl. Spec. Mstr. Aug. 27, 2020) (awarding $160,000.00 for past pain and suffering); *Gruba v. Sec'y of Health & Hum. Servs.,* No. 19-1157V, 2021 WL 1925630 (Fed. Cl. Spec. Mstr. Apr. 13, 2021) (awarding $165.000.00 for past pain and suffering and $500.00 per year for future).

[11] *T.M. v. Sec'y of Health & Hum. Servs.,* No. 19-0911V, 2023 WL 355358 (Fed. Cl. Spec. Mstr. Dec. 19, 2022); *Dillenbeck v. Sec'y of Health & Hum. Servs.,* No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. Jan. 23, 2023), *aff'd in relevant part,* 147 Fed. Cl. 131 (2020). Although the pain and suffering component of the original *Dillenbeck* award was affirmed, the case was remanded for further proceedings related to lost wages and a final damages award. *See Dillenbeck v. Sec'y of Health & Hum. Servs.,* No. 17-428V 2020 WL 3046113 (Fed. Cl. Spec. Mstr. May 5, 2020) (awarding $218,171.74 which included a pain and suffering component of $170,000.00 for past and $10,857.15 for future).

[12] The declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Ex. 44.

[13] Dr. Jeret's curriculum vitae ("CV") states he is a neurologist with an active practice on Long Island, New York. Ex. 30 at 1, filed May 5, 2023, ECF No. 49-3.

and anxiety," but insists that "she had always been a highly functional, motivated, and outstanding employee." *Id.* at 20. Petitioner's vocational expert, Staci Schonbrun, Ph.D.,[14] calculated her annual lost earnings to be $53,201.80, and her economist Robert W. Cook, Ph.D.[15] calculated her total lost wages to be the amount sought (with the future portion reduced to net present value). Brief at 21-23; *see* Ex. 44 (Dr. Schonbrun's report); Exs. 47-48 (Dr. Cook's first report and calculations).

Respondent counters that $120,000.00 is an appropriate amount for Petitioner's past pain and suffering, and that no compensation should be paid for future pain and suffering or lost wages. Opp. at 1, 11. Acknowledging that Petitioner continues to suffer "mild residual symptoms," Respondent maintains that they "alone are not sufficient to justify an award of future pain and suffering." *Id.* at 30. He insists that "the evidence in this case does not support [P]etitioner's claim that she suffered cognitive effects of GBS, or that her GBS sequelae rendered her unable to do her job." *Id.*

Emphasizing that Petitioner's GBS required only a six-day hospitalization involving the administration of five doses of IVIG therapy, no inpatient rehabilitation, and only 13 PT sessions accompanied by reports of little to no pain, Respondent "contends that [her] clinical course and recovery . . . demonstrate a less severe course of GBS than others, comparatively." Opp. at 25. He asserts that "[P]etitioner cannot reasonably attribute all of her claimed pain and suffering to GBS, given her chronic conditions pre-vaccination, including urinary incontinence, sleep apnea, right knee pain, right elbow pain, lower back pain, and right leg sciatica." *Id.* at 26. Thus, Respondent maintains that some of the later treatment Petitioner pursued, like the many of the attended PT sessions, cannot be linked to her GBS. *Id.* at 26.

As a comparable case, Respondent proposes *Castellanos*[16] - a case involving a petitioner with numerous co-morbidities who received a past pain and suffering award of $125,000.00. Opp. at 27. He contends, however, that Petitioner's award should be slightly less because she did not require inpatient rehabilitation or any mobility aids and was walking five to six miles in one day less than three months after her GBS diagnosis. *Id.* at 27. He also maintains that the clinical course of all petitioners in the cases cited by Petitioner were more significant. *Id.* at 28-30.

---

[14] Dr. Schonbrun's CV was filed with her report on July 5, 2023. Ex. 45, ECF No. 51-3.

[15] Dr. Cook's CV was filed with his first report on July 31, 2023. Ex. 49, ECF No. 54-4.

[16] *Castellanos v. Sec'y of Health & Hum. Servs.,* No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. Mar. 30, 2022).

Relying upon the report of his vocational expert, Behnush Mortimer, Ph.D.,[17] Respondent characterizes as "unsubstantiated" Petitioner's claim that "as a result of her GBS, she suffered cognitive decline that rendered her unable to fulfill her job requirements, and she was forced to retire." Opp. at 32. Dr. Mortimer emphasizes Petitioner's prior unhappiness, anxiety, and stress at work; her plans to leave her position before contracting GBS; and her hesitancy to return to this stressful work environment. *Id.* at 32-33. Observing that Petitioner returned to work with no noted issues for seven months before voluntarily retiring to start her own consulting firm - a plan which by her own admission was derailed not by her physical and mental condition, but rather by the COVID Pandemic (*id.* at 33-34), "Dr. Mortimer concluded that [P]etitioner was capable of continuing to work in her position at VCU [Virginia Commonwealth University]" (*id.* at 34).

Although he agrees with Dr. Jeret's assertion that Petitioner suffered long term effects of her GBS, Dr. Mortimer observes that that Petitioner "experienced anxiety and depression before and after her GBS." Opp. at 35. He also opines "these conditions did not limit Petitioner's employment." *Id.* Dr. Mortimer criticizes Dr. Jeret's disregard for "the results of [P]etitioner's neurological testing" and Dr. Schonbrun's failure to address "whether, in her opinion, [P]etitioner was limited to part-time employment." *Id*.

If I determine that a lost wages award is appropriate in this case, Respondent maintains that Petitioner's expert Dr. Cook has substantially overvalued the amount at issue, due to multiple errors in his calculations as noted by his economist, Patrick F. Kennedy, Ph.D. Opp. at 37. Specifically, Dr. Kennedy asserts that Dr. Cook overstated Petitioner's life expectancy and failed to account for offset earnings or benefits, the five percent salary contribution Petitioner was required to pay for Virginia Retirement System benefits, and the portion of the employer provided health premiums paid by Petitioner. *Id.* at 37-38. Dr. Kennedy calculated a net present value for lost wages of $38,164.00 if Petitioner was limited to part-time work. If Petitioner is able to work full-time, Dr. Kennedy opined she would actually incur a *net benefit* of $136,735.00, due in part to her ability to begin collecting her pension as long as she avoided employment by the State of Virginia. *Id.* at 38, 38 n.14.

On reply, Petitioner reduced the amount she seeks for lost wages to $216,767.00 based upon Dr. Cooks's rebuttal economic report, provided on February 23, 2024. Reply at 1, 1 n.1 (referencing Ex. 51 – Dr. Cook's second report). Stressing her prior performance reviews, especially the last one dated nine months prior to her GBS (*id.* at 3), Petitioner disputes Dr. Mortimer's claim that she "had been unhappy in her position and was considering separating from her employment," characterizing it as speculative (*id.* at 2). She insists that her memory deficits and lack of focus prevented her from

---

[17] Dr. Mortimer's CV was included in his report filed on Dec. 15, 2023. Ex. A at 21-24, ECF No. 58-1.

continuing her employment. *Id.* at 4-6.

Regarding her pain and suffering award, Petitioner contends that the case Respondent cites, *Castellanos*, is not analogous to her circumstances because that petitioner "made a very good recovery in five (5) months of vaccination" and suffered numerous unrelated co-morbidities. Reply at 10. She maintains that the comparable cases she cited are more equivalent. *Id.* at 10-11.

### IV.    Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical treatment evidence, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

*Past Pain and Suffering*

The evidence shows that Petitioner - age 58 when vaccinated - suffered a mild GBS illness (specifically AIDP) and Bell's Palsy, involving common symptoms such as weakness, tingling, numbness in the upper and lower extremities, slight gait instability, and facial numbness and drooping.[18] Although her symptoms improved significantly in response to a five-day course of IVIG administered during six-day hospitalization, and minimal physical therapy ("PT") thereafter,[19] Petitioner continued to complain of residual

---

[18] During a second trip to the emergency room ("ER") on November 23, 2018, Petitioner received a diagnosis of Bell's Palsy for which she was prescribed medication. Ex. 4 at 20 (symptoms included numbness and facial drooping); *see also* Ex. 3 at 12 (November 20, 2018 ER visit for numbness and tingling in the hands and feet, dizziness, and a headache with pain traveling down her back). After a visit to the neurologist on November 26, 2018 (Ex. 5 at 7), Petitioner returned to the ER on November 30, 2018 (Ex. 3 at 87). She was admitted to the hospital, diagnosed with AIDP, and prescribed a five-day course of IVIG therapy. *Id.* at 160.

[19] Petitioner was discharged from the hospital on December 6, 2018. Ex. 3 at 93. Noting continued issues with memory (slight confusion) but improvement related to numbness and speech, the discharging physician predicted Petitioner's recovery would be slow and she would be unable to return to work for three months – until at least early March 2019. *Id.* During outpatient PT in December 2018, Petitioner continued to experience some gait instability and moderate pain levels. *E.g.,* Ex. 6 at 171 (December 11, 2018 PT session). By January 2019, she consistently reported no pain (*id.* at 126, 133, 148) and had met many of her short and long-term goals (*id,* at 142-43).

10

symptoms, such as fatigue and difficulties with her memory. *See,* e.g., Ex. 7 at 41 (neurology visit on April 24, 2019).

During this time, Petitioner also sought treatment for symptoms she experienced prior to vaccination, such as neck, hip, and back pain and urinary incontinence.[20] Although she attributed some of these symptoms to her current illness (*see,* e.g., Ex. 6 at 52), Petitioner's prior medical records clearly establish that she suffered significant pain in her back, legs, fingers, right shoulder, right elbow, and right knee; urinary incontinence and bladder issues after undergoing a sling procedure in 2009; and significant stress and anxiety related to her work environment and relationship with her husband.[21] Despite some trepidation,[22] Petitioner returned to work as Director of Real Estate at VCU on a part-time basis (four hours a day) beginning on May 1, 2019, and full-time two weeks later. Ex. 6 at 18.

During appointments with two different treating neurologists in August and October 2019, Petitioner received reassurances that her condition was not as significant as she feared.[23] It also was noted that Petitioner continued to see a psychotherapist who was helping her with her ongoing anxiety.[24] And the PT sessions Petitioner attended during the remainder of 2019 focused primarily on Petitioner's prior conditions. *See,* e.g., Ex. 8 at 3 (treatment of right arm, elbow, foot, and knee pain).

---

[20] On December 28, 2018, Petitioner attended a follow-up orthopedic appointment for lower back pain. Ex. 15 at 13-16. Pursuant to a referral from her orthopedist, she attended an appointment with a spinal specialist for several years of back pain on April 18, 2019. Ex. 6 at 52-66. Petitioner complained of urinary incontinence at her annual gynecology exam on February 19, 2019 (Ex. 14 at 23-25) and began PT to strength her pelvic floor on April 23, 2019 (Ex. 8 at 65).

[21] Petitioner frequently mentioned stress and anxiety related to her job and marital issues while seeking treatment for these conditions in late 2015 through early 2018. Ex. 6 at 185-207. She also complained of leakage and urinary incontinence in 2015, when it was noted that she has undergone a sling procedure performed in 2009. *E.g.,* Ex. 6 at 236. And she attended consistent orthopedic and physical therapy ("PT") for a variety of conditions. Ex. 6 at 251-252; Ex. 12I Ex. 15.

[22] At a neurology visit on April 24, 2019, Petitioner requested "more time off work as she fe[lt] that her stamina and focus [wa]s not up to par with what [wa]s required to fulfill her job requirements." Ex. 7 at 41.

[23] At a visit on August 14, 2019, Petitioner's neurologist "reassured her . . . that the episode of GBS that she suffered . . . was not severe and that her recovery should be near total, if not total." Ex. 7 at 56. On October 28, 2019, a second neurologist informed Petitioner that an administered EMG did not show any evidence of chronic inflammatory demyelinating polyneuropathy ("CIDP", that her symptoms were improving, albeit slowly, and that she should continue to improve but may "be left with some residual symptoms." Ex. 10 at 24.

[24] At the August 14, 2019 visit, Petitioner reported that "she [wa]s seeing a psychologist who is addressing unresolved circumstances that she is struggling with." Ex. 7 at 56; In October 3019, she again stated that "[s]he ha[d] been seeing a health psychologist since May and . . . her cognition, concentration, and processing speeds ha[d] improved over the past several months." Ex. 10 at 18.

11

In December 2019, Petitioner retired from her position at VCU with plans to start her own consulting business. Ex. 19 at 5; Ex. C at 10-14 (Petitioner's 2014 federal income tax return showing start-up costs, self-employment tax, and a carryover business loss from Kind Collaborations, LLC). By Petitioner's own admission, these plans were derailed not by her residual symptoms, but by the COVID pandemic. Ex. 19 at 5.

By early February 2020, Petitioner's urinary incontinence had resolved, and she was working with a trainer and walking five days a week. Ex. 9 at 16-20. Additionally, many ongoing symptoms were likely related to her prior conditions. On July 22, 2020, Petitioner underwent a surgical decompression and fusion to treat her diagnoses of spinal stenosis[25] and isthmic spondylolisthesis.[26] Ex. 20 at 1303-1310. After suffering a surgical site infection, Petitioner was forced to return to the hospital in early August 2020 for a surgical debridement and washout. *Id.* at 668-677. During the remainder of 2020 through early 2021, she received follow-up care from an infectious disease specialist. Ex. 18.

On November 17, 2020, Petitioner underwent testing which revealed cognitive results within a normal range, despite her perception of deficits in these areas.[27] Instead, the test administrators concluded that her ongoing difficulties were most likely due to significant anxiety and long-term organizational deficits which existed prior to Petitioner's GBS illness.[28] By Petitioner's own admission, she likely suffered from prior, long-term organizational and attention deficits which had never been recognized or diagnosed. Ex. 20 at 117. And her work assessments contain numerous entries revealing weaknesses in these areas. Ex. 26. Thus, this testing provides significant evidence countering Petitioner's assertion of GBS-related sequela which affected her ability to perform her work duties.

---

[25] Spinal stenosis is a "narrowing of the verbal canal, nerve root canals, or intervertebral formina of the lumbar spine caused encroachment of bone upon the space. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1770 (32th ed. 2012).

[26] Spondylolisthesis is the "forward displacement (olisthy) of one vertebra over another." DORLAND'S at 1754. Isthmic spondylolisthesis is spondylolisthesis accompanied by a lesion of the pars interarticularis." *Id.*

[27] Specifically, the report stated that "a cognitive profile that was generally within normal limits across domains[27] . . . [but] a relative personal weakness in problem solving abilities . . . [and] mood measures . . . indicative of clinically significant anxiety and mild depression, consistent with her self-report during the interview." Ex. 20 at 118. Petitioner's memory was noted to be "intact and in some cases, strong." *Id.* at 119.

[28] The report concluded that Petitioner "d[id] not meet the criteria for a cognitive disorder, and . . . it is likely that the perceived difficulties in daily life could be due to psychological factors, as disruptions in mood and general life stress can hinder an individual's ability to function at maximum cognitive capacity." Ex. 20 at 119.

Additionally, the testing showed that Petitioner had a skewed perception of her cognitive abilities, believing she "was performing worse on testing tha[n] she actually was." Ex. 20 at 117. And this pessimistic view is echoed throughout the medical records. *See,* e.g*.,* Ex. 7 at 56. Because evidence such as the letter provided by Petitioner's clinical psychologist (Ex. 27) and sworn declarations from her friends (Exs. 21-22) relied heavily upon Petitioner's representations, their probative effect is lessened.

Although it is difficult to ascertain the exact duration of Petitioner's AIDP and Bell's Palsy illness (given the simultaneous, likely unrelated co-morbidities suffered during this same period), it appears that her acute phase (which involved only mild symptoms) lasted a few months. No doubt, Petitioner was frustrated by ongoing symptoms of fatigue and cognitive difficulties, but these residual symptoms are common in most GBS patients. Thus, they do not equate to a greater pain and suffering award in Petitioner's case. Furthermore, as discussed in greater detail in the section below, Petitioner has not provided sufficient evidence to show that she was forced to retire early due to her vaccine-related illness.

Still, considering Petitioner's ongoing sequelae, the amount proposed by Respondent ($120,000.00) is lower than what the facts and circumstances warrant. As I have explained previously at expedited "Motions Day" oral arguments, GBS pain and suffering awards should usually be higher than in matters involving a less frightening and physically-alarming injury, such as SIRVA. *See,* e.g*., Gross,* 2021 WL 2666685, at *5.

Instead, I find the cases cited by Petitioner involving past pain and suffering awards ranging from $155,000.00 to $160,000.00 offer the best comparisons. I also find the *Poteet* and *Longo* cases, involving past pain and suffering awards of $160,000.00, to be particularly instructive. *Poteet v. Sec'y of Health & Hum. Servs.,* No. 20-1295V, 2024 WL 1435308, at *5 (Fed. Cl. Spec. Mstr. Feb. 27, 2024); *Longo v. Sec'y of Health & Hum. Servs.,* No. 21-0844V, 2023 WL9326039, at *4 (Fed. Cl. Spec. Mstr. Dec. 20, 2023). All involved relatively mild GBS illnesses that were successfully treated in response to one course of IVIG therapy administered during a short hospital stay, and with minimal outpatient PT thereafter. *W.B.,* 2020 WL 5509686, at *2-5; *Gross,* 2021 WL 2666685, at *4-5; *Robinson,* 2020 WL 5820967, at *2-3, 6; *Poteet,* 2024 WL 1435308, at *3-4; *Longo,* 2023 WL9326039, at *1, 3-4. And like Petitioner, none of these claimants experienced significant residual symptoms. *Id.*

Petitioner's facts and circumstances do not rise to the level of that suffered by *T.M., Dillenbeck,* or *Gruba.* These petitioners suffered more severe symptoms, required at least one week of inpatient rehabilitation following hospitalization, and obtained an incomplete recovery. *T.M.,* 2023 WL 355358, at *2-6; *Dillenbeck,* 2019 WL 4072069, at *1-2, 14; *Gruba,* 2021 WL 1925630, at *1-2. In addition, they provided evidence of significant

13

ongoing sequela sufficient to warrant a component of damages for future pain and suffering, or evidence of hardships experienced in their actual lives. *T.M.,* 2023 WL 355358, at *19; *Dillenbeck,* 2019 WL 4072069, at *15; *Gruba,* 2021 WL 1925630, at *4-5.

*Future Pain and Suffering*

Future pain and suffering awards are appropriate "only for cases where a strong showing is made that the claimant has suffered a permanent disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). In this case, Petitioner has not established that the sequela of her GBS continued beyond the very mild – yet improving - symptoms she reported in 2020. She also suffered from co-morbidities which could account for much of her difficulties. More importantly, the record does not establish a notable permanent loss that would justify this component of damages (beyond the usual lingering sequelae, which I can address, and do, in the size of my award for actual pain and suffering). Petitioner has not shown that the residual symptoms she continues to suffer will have as significant an effect on her in the future. Thus, I do not find that an award for future pain and suffering is warranted in this case.

## V.    Appropriate Compensation for Lost Wages

Prior to vaccination, Petitioner's struggled with aspects of her job (*see* Ex. 26 – prior evaluations) and experienced significant work-related stress (Ex. 16 at 205). On multiple occasions, she contacted an attorney to discuss her work-related options, acknowledged that she was job hunting, or reported that she had ceased such efforts due solely to the fear that her employer would learn of them. *Id.* at 193, 195, 200, 205. And her stress and anxiety after a particular employee, noted to be bullying her, left did not appear to significantly diminish.[29]

Petitioner clearly expressed a reluctance to return to her job following her illness. The record, however, establishes that Petitioner's views regarding her limitations were often heightened, exceeding her treating physician's assessments or what testing revealed. Ex. 20 at 117. And the declarations provided by Petitioner's friends appear to

---

[29] In late 2015, Petitioner assumed that her work environment would improve after another employee, who was bullying her, was fired. Ex. 16 at 185. However, Petitioner continued to report work-related issues. *See,* e.g., *id.* at 193. In late 2017, she also believed a new supervisor, recently hired, would help bring about improvements (*id.* at 202), but reported job hunting shortly thereafter (*id.* at 205). And the new supervisor continued to assess her job performance as either successful or developing (one step below Petitioner's self-assessment) and to note issues with responses, organization, and attention to daily tasks. Ex. 26 at 1-15.

14

be based in large part upon accounts related to them by Petitioner, and also contain some obvious factual errors. For example, one friend stated that after returning to work, Petitioner "received the most negative annual evaluation she ha[d] ever received." Ex. 21 at ¶ 6. But, in briefing, Petitioner acknowledged that she received no evaluation during the seven months of work she performed post-vaccination. Reply at 6. Petitioner has provided no evidence showing that her job performance after returning from her illness was poorer than in prior years.

Most importantly, it does not appear that Petitioner encountered any significant difficulties after her return to work exceeding the issues identified in evaluations prior to her illness. When undergoing cognitive testing in November 2020, even she acknowledged that her retirement in December 2019 was "due *in part to perceived* cognitive/functional difficulties performing work tasks." Ex. 20 at 116 (emphasis added). And the testing revealed Petitioner's difficulties were related not to problems with her memory, but with her long-term difficulties with organization and anxiety. *Id.* at 118.

Furthermore, Petitioner planned to continue working as a self-employed consultant – a plan that was derailed by the COVID Pandemic, rather than the effects of any GBS sequelae. Ex. 19 at 5. And Petitioner has worked as independent contractor since 2021. Ex. 46 at ¶ 11; *see* Ex. 23 (one-year Independent Contractor Agreement with Icon Realty Group executed on December 28, 2020). As Dr. Kennedy noted, Petitioner's ability to both work and receive pension payments actually places her in an advantageous financial position. Ex. B at 6.

Petitioner has simply not met her burden to prove preponderantly that she should receive a lost wages damages component due to her vaccine-caused GBS.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $160,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.[30] Additionally, Petitioner is entitled to the agreed upon amount for past/actual unreimbursed expenses, $1,098.08, but no amount for future/projected pain and suffering or lost wages.**

---

[30] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

I therefore award Petitioner a lump sum payment of **$161,098.08, representing compensation in the amounts of $160,000.00 for actual pain and suffering and $1,098.08 for actual unreimbursable expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[31]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[31] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.